Carl J. JENSEN, Plaintiff and Respondent,

v.

Albert BOUWHUIS and Lola W. Bouwhuis, Defendants and Appellants.

No. 15198.

Supreme Court of Utah.

March 15, 1978.

---

Richard Richards, of Richards & Mecham, Ogden, for defendants and appellants.

George B. Handy, Ogden, for plaintiff and respondent.

ELLETT, Chief Justice:

The defendants as sellers and the respondent as purchaser entered into an Earnest Money Receipt and Offer to Purchase Realty, the terms of which provided for the payment of the sum of $1,000 upon acceptance by the seller; $14,000 on delivery of the deed or final contract of sale; and the balance to be paid at the rate of $8,000 per year for ten years, plus interest at the rate of seven percent (7%).

The agreement was conditioned on the buyers being able to secure building permits and further conditioned on the parties being able to "negotiate on land release basis." It was further agreed that the land would be surveyed, but the document was silent as to who would pay the cost thereof.

The Earnest Money Receipt also provided that the deed or final contract would be completed on or before March 1, 1976, and would be made upon the approved form of the Ogden Board of Realtors. The reason for this provision was that the land was under the Greenbelt law for tax assessment, and the seller needed to continue with his farming operation in order to have a low assessment on the land for tax purposes. He wished to mow the grass and put his cattle on the land by March 1, 1976, if the sale did not go through.

The purchaser intended to develop the land for commercial purposes and to sell the land to interested parties in order to raise funds for the annual payments. He testified regarding the need for a land release agreement in the document as follows:

I told him just whatever it takes, you know, as long as I can see that I am not landlocked. If I decide—I don't want to be tied down to a certain deal. If I need another piece over here, something to put a particular type customer in, I want to be able to do that.

In order for the purchaser to know which lots he could offer to various customers, he said he needed a survey of the property, but he refused to have the survey made; and while the Earnest Money Receipt was prepared at his own direction, he neglected to make a provision for who would stand the cost. The seller emphatically stated at the time of the execution of the document that he would not bear the cost of the survey or any part thereof, because he knew how much land there was in the tract as the heirs had earlier caused a survey to be made when his father's estate was probated. In fact, the seller never ordered a survey.

No final contract of sale was entered into by the parties and no money was ever tendered to the seller. Within a month after the March 1, 1976, deadline, the seller announced that he would not go through with the deal.

About the end of November, 1976, long after the seller refused to proceed, the realtor ordered and paid for a survey in the hope of getting the parties together so that he could receive his fee of $3,000.

While the purported deal was for the purchase and sale of land, the trial judge, sitting without a jury, misinstructed himself in the law and made the following findings:

The land release was to be 'negotiated.' This is not a contract to make a contract in the future, but is actually as complete an agreement as was possible under the circumstances. The agreement is by its terms not an ordinary sale of real estate to be paid off in a certain period of time. It is actually the formation of a joint venture and/or partnership under certain terms. This agreement was made with the following clear understanding on both sides:

\*    \*    \*    \*    \*    \*

That the seller's tax picture would be hurt if he were forced to accept a complete purchase price at any one time, but would be able to turn the $100,000.00 into long-term capital gains spread over the years if there was a land-release arrangement worked out so that he could claim separate sales in separate years and also not destroy his security in the transaction.

There was no way at the time in question that the parties could have formulated a more complete agreement than the one actually formed (the word 'negotiated' had a clear meaning to the parties), in that 1P [Earnest Money Agreement] states what was understood by the parties to be their full agreement, that is that they were going into a joint venture or partnership in the sale of the land. . . . There was no way to know what size the lots would be nor what shape lots would be desired by various industrial users. There was no way to know whether the industrial users of the future would desire land in the rear or land in the front. The contract was in truth and in effect a completed contract.

It was the clear intent of both sides to leave the manner of acreage release to the future and to the desires of the available industrial park purchasers or leasors so long as it did not impair the defendants' security interest.

The contract in effect has created a joint venture in the sale of industrial park lands wherein the plaintiff contracted to risk the purchase price of $103,-000.00, plus interest, and development monies. The defendants were to risk some loss of security during the sell-off stages, but in return therefore were to receive not only the purchase price but the tax advantage secured by a write-off over the years in question, to-wit: ten years.

The court then entered its judgment wherein the following language is used:

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that if the joint venturers cannot agree on the matter so as to preserve some of the intended benefits, such as the ability of the plaintiff to make his payments over a long period of time and therefore not be required to raise capital and the sellers are to effect the tax advantage through long-term capital gains spread over certain years, they may do so. If the partners cannot make an agreement within the next thirty days so as to preserve these benefits, then the Court dissolves the partnership or joint venture by the following order: The plaintiff must pay into the court within thirty days after the expiration of the thirty-day negotiation period the sum of $102,000.00 minus attorney's fees. If he does not desire to do this to secure land title, then he must be satisfied with the return of his $1,000.00 that he has paid in earnest money, plus the interest from the date that the money was paid in.

It clearly appears that the court could see that it could not enforce the agreement as a contract for the reason that there were too many things which were to be negotiated in the future, viz: (a) who would pay for the costs of the survey; (b) the negotiation of the land release; (c) the failure to enter into a final contract by March 1, 1976, and etc.

The unsettled matter of agreeing on a land release contract was of particular concern to both parties. Land is unique and the seller was to use the part that was not transferred away for a period of ten years. Neither party wanted to have land which had no outlet. Agreeing on the release was

clearly a matter for future contractual arrangements. The purchaser had dictated the terms of the Earnest Money Receipt and had he then been able to foresee what land he would need as he paid for it, he should have provided for it. It appears doubtful that the seller would have signed any contract that gave the purchaser the right to choose the land he wanted as he made the annual payments.

The court cannot compel the purchaser to pay $102,000 less attorney's fees, nor can it compel the seller to receive all the money at once, thus causing a great loss to him in the form of a high income tax rate.

The courts have never felt that it was their duty to write a contract for the parties; and where the matters are not clearly set out, courts of equity refuse to grant specific performance.

In the case of *Davison v. Robbins,*[1] et al., the vendee was to select two hundred acres of land from a larger tract which was properly described. The vendee sued for specific performance and this Court held:

. . . . The issue was whether the description was sufficient so that there was a valid contract which could be enforced by specific performance. This court cited *Scanlon v. Oliver,* 42 Minn. 538, 44 N.W. 1031 wherein the court explained the relevant distinctions between two types of cases. In one, the contract grants one party the exclusive right of selection, and the contract thus provides a definite means by which the location and description of the land may be definitely determined without any further agreement of the parties. In the other type, the writing provides that the particular piece of property to be conveyed is to be mutually agreed upon by the parties, i. e., the mode provided for the location and description of the land is the future agreement of the parties. In the *Calder* case this court concluded that the writing constituted a valid and enforceable contract, since the agreement provided that the vendee was to select the land within a given time, and nothing more had to be agreed upon between the parties.

In the instant action, the agreement in clear and unambiguous terms provided that the location and description of the land to be conveyed was subject to the future mutual agreement of the parties. This writing constituted a mere expression of a purpose to make a contract in the future, for the whole matter was contingent on further negotiations. The trial court erred in its conclusion that the writing constituted a valid, enforceable contract.

The trial court ordered the parties to agree (something they did not do in the signed document or thereafter), and in case they could not agree within thirty days, the judge would make a contract for them which neither had ever thought of making; and if the purchaser did not accept the judge's terms of the new contract, he, the purchaser could get the money back which he paid at the time the seller signed the Earnest Money Receipt, plus interest. No option was given the seller; he is stuck with the judge's idea as to what terms they should have agreed upon.

There is no element of a partnership or a joint venture in this case. Those findings must be ignored.

This Court cannot accept the contract of partnership or joint venture as ordered by the trial court for it either creates a different contract or it attempts to breathe life into one that never came into existence. This Court will not compound the error by ordering specific performance.

In the document prepared by the purchaser to be presented to the seller, there is a provision that the purchaser may pay more than $8,800 per year. The seller could not read the document which he signed and the realtor promised to type a copy for him; but no copy was ever given to him. All understood that the final contract would not permit more than twenty-nine percent (29%) to be paid in any one year. Therefore, if the court could make and enforce a

1.  30 Utah 2d 338, 517 P.2d 1026 (1973).

different contract between the parties, it could not, in equity and good grace, require the seller to pay income tax upon the total sale price in one year.

The purchaser never offered to buy the entire tract of land until months after the seller had renounced the deal. There never was a valid contract made and, therefore, no specific performance could be decreed. The purchaser gave $1,000 to the realtor who, in turn, submitted the bid to the seller, but not one cent was ever tendered to the seller.

We reverse the judgment made and remand the case to the district court with directions to enter judgment for the seller for no cause of action. Since the purchaser did not pay the seller any money, we leave it to the purchaser to get his money back from the realtor if he can. There being no contract, no attorney's fee could be awarded, and the seller is awarded costs.

MAUGHAN, and WILKINS, JJ., concur.

CROCKETT, Justice (dissenting).

By the earnest money agreement the plaintiff agreed to buy and the defendants agreed to sell the 38.9 acres of land for a purchase price of $103,000, of which the plaintiff would pay $1,000 earnest money, $14,000 "upon delivery of deed or final contract of sale and $8,800 per year plus interest, commencing one year after the closing, until the balance was paid. It included three conditions: (1) that the property be surveyed; (2) that the buyer (plaintiff) be able to secure building permits in order to go forward with the development of an industrial park; and (3) that the parties would negotiate and agree upon a plan whereby portions of the land would be released as payments were made by the plaintiff.

We should assume that the trial court believed those aspects of the evidence which support its findings and judgment. In doing so it is clear that it was justified in its view that shortly after executing the agreement the defendant Albert Bouwhuis (who

acted for the defendants) was affected by what is sometimes referred to as "sellers remorse"; and in reciting in its findings that he "had immediate misgivings and desire to escape from the contract"; wherefore he "refused to carry out the terms of the contract because of hope for an improved sale price."

In regard to condition (1) above: there is evidence to support the trial court's finding that the defendant Albert Bouwhuis "attempted to prevent the survey." But despite his efforts to prevent getting the survey completed, it was in fact completed and no controversy now exists with respect thereto.

In regard to condition (2): within a month after the execution of the agreement, plaintiff notified the defendant's real estate broker that the building permits were available and that he would agree with any proposal the defendants made as to lot releases.

The only remaining controversy is condition (3), regarding the projected release of certain portions of the land as plaintiff would make payments on the purchase price. The position essayed by the defendants is that because the details as to the time and amount of property to be released in this program had not been specified, that the prime contract was but an agreement to agree. The correctness of the general rule that the terms of a contract must represent a clear and definite meeting of the minds of the parties it is not doubted.[1] But like all general rules it should be applied in a sensible and practical manner to do justice, rather than to defeat it.

A refinement of that general rule is that a contract is valid and enforceable if it is sufficiently certain that it represents the intent of the parties at the time of its execution, so that if they proceed in good faith thereunder each will know and be able to perform in accordance with the rights and duties it creates. It is also elementary that there is implied in any contract an obligation of the parties to carry out its

1. *Pitcher v. Lauritzen,* 18 Utah 2d 638, 425 P.2d 491 (1967).

covenants in good faith;[2] and further, that where a party fails in that regard, and particularly if he acts to hinder or prevent the fulfillment of required conditions, he can claim no advantage to himself because those conditions were not fulfilled.[3] The matter of good faith is fundamental and it should be the key to the solution of the controversy in this case.

The main reason defendants state in objecting to performing the contract without agreements as to specific parcels to be released is that plaintiff might want to release the frontage first and leave some of the property landlocked and thus diminished in value. The first rejoinder to this is that both the plaintiff and defendants would have an interest in preserving and enhancing the value of the entire property and that this would redound to the advantage of both by helping the project succeed so the plaintiff could pay the defendants the purchase price as they had agreed to accept it.

Even more important is the fact that the plaintiff indicated that he would agree with any proposal the defendants would make as to land releases. Moreover, he stated his willingness to make the payments either in accordance with the terms of the agreement, or the entire amount. This places that matter effectively under the control of the defendants; and it should eliminate any honest apprehension on their part that release of some portions of the property might impair accessibility to the rest and diminish its value. It may be that they would not be willing to release any of the frontage, or at least none that would substantially reduce the value of the rest and thus impair their security. But inasmuch as plaintiff is willing to take that risk, defendants cannot be hurt. There is thus exposed the fallacy of the defendant's argument that the contract cannot be performed because the time and manner of release of lots has not been specified; and it confirms the view of the trial court that the defendants are but using specious excuses rather than bona fide grounds for refusing to perform the contract.

In this dissent I make no defense of the recitals in the findings to the effect that the plaintiff and the defendants were in a joint venture or partnership with respect to this property. That language was concededly not well chosen if scrutinized in the technical legal sense of those relationships.[4] However, if the findings are looked at in their total context, it is apparent that their general purport and intent was to the effect that both parties were interested in the successful development of this property, and that both had obligations to proceed in good faith according to the contract, to the end that the plaintiff would benefit by being able to carry out his plan and the defendant would benefit by receiving the purchase price he had agreed to accept for his property, on either a short-term or a long-term basis. It is our duty to look to the substance, rather than to the form, and to affirm the trial court if a survey of the total record indicates that the interests of justice so require.[5]

In accordance with what has been said above, even though it would be necessary to reverse that portion of the judgment relating to joint venture or partnership between plaintiff and the defendants, it is my opinion that the record supports the findings, and the judgment that the defendants

---

2. *Zions Properties, Inc. v. Holt,* Utah, 538 P.2d 1319 (1975). See also 17A C.J.S. Contracts § 468(a); Williston, Contracts, 3rd. ed., Section 670.

3. 17 Am.Jur.2d, Contracts, Section 427; 81 C.J.S. Specific Performance § 57; Williston, Contracts, 3rd, ed., Section 677; *Wallerius v. Hare,* 194 Kan. 408, 399 P.2d 543 (1965); *Gibson v. J. T. Allen Agency,* Wyo., 407 P.2d 708 (1965).

4. As to the elements to establish a joint venture, including the sharing of profits see *Bassett v. Baker,* Utah, 530 P.2d 1 (1974); *Bates v. Simpson,* 121 Utah 165, 239 P.2d 749 (1952); *Ellingson v. Sloan,* 22 Ariz.App. 383, 527 P.2d 1100, as to partnership see *Koesling v. Basamakis,* Utah, 539 P.2d 1043.

5. See *Goodsel, etc. v. Dept. of Bus. Reg.,* Utah, 523 P.2d 1230 (1974), citing 5 C.J.S. Appeal and Error § 1464(1).

should be required to go forward in good faith performance of the contract as made by the parties.

HALL, J., concurs in the views expressed in the dissenting opinion of CROCKETT, J.